Case number 22-1204, et al. Thrifty Payless, Inc., Doing Business as Right Aid, Petitioner, v. National Labor Relations Board. Mr. Silvestri for the petitioner, Ms. Beard for the respondent. Good morning. My name is Steven Silvestri. I'm here for Thrifty Payless, which I'm going to refer to as Right Aid, because that's their current corporate name, with me on the brief and here at the Council table is my colleague, Elena Glover. So I've reserved two minutes for rebuttal. There are three reasons we're urging for denial of enforcement of the NLRB decision here. One is that it implied the impractical and inappropriate statements of the NLRB. The second is that the NLRB did not meet the standard in determining there was no exit circumstances that allowed Right Aid to move the coverage of medical insurance from a co-sponsored health plan to Right Aid's plan. The second is that the ALJ and the Board ignored inappropriate and refused to consider uncontradicted record evidence that there was impasse at the time we moved it. And the third is that the NLRB, not to judge, but the NLRB inappropriately ordered Right Aid to make payments of all of its contributions as a remedy. That remedy wasn't requested in the complaint. No evidence was taken. The GC, the General Counsel of the Board, never introduced any evidence about that at trial. There are important facts in the record that I want to point out first. One is that the bargaining unit here had 3,000 associates, and the number of covered lives were more than 10,000 in this plan. This wasn't a plan of a few hundred employees. There were many, many covered lives here. So the second is that the Right Aid and the union had a long history of collective bargaining. This is not something that's new. It's not something that Right Aid or the union approached with unprofessional negotiators or inexperienced counsel. The annual contributions of Right Aid, the third point is, through the collective bargaining agreement, were like a per-hour rate for as many hours as the employees worked, so they were over $20 million a year to cover these associates in this plan. But the exigency standard in this court is that the employer must show the exigency was caused by external events, was beyond its control, or was not reasonably foreseeable. Mr. Silvestri, can I ask you about your remedy argument? Yes. I'm not sure, are you saying that there was an alteration of the board compared to the remedy by the ALJ? Yes. I know you're saying that. Are you saying that that alteration created a windfall? Yes. It definitely could create a windfall, because obviously when Right Aid switched the coverage of the plan from the union, from the Valley Employers Trust Fund, to the Right Aid plan, it continued to pay exactly those amounts for benefits. It sounds like what you're challenging in terms of remedy is the alteration, not what came before the alteration. Right. It's the alteration of having to pay without taking any credit for the amounts that Right Aids have already put in. The government says you can make your argument at the compliance proceedings. That's true, as long as the compliance judge doesn't accept as fact that remedy. Doesn't accept what? As fact, the remedy that's ordered by the board. If the compliance judge is saying, okay, now I'm willing to hear evidence and make findings with respect to the amounts you paid and whether there are any gaps in that. I think the government says, and I'll confirm with the government, but I think the government says that in the compliance proceedings, they can do that regardless of what we do here. Well, maybe. With regard to remedy, regardless of what we do here. Do you agree with that? No, I would simply suggest that you have the power to order that. Okay, I know that, but let's say that we don't and then you argue in the compliance proceedings your windfall argument. The government says the compliance proceeding resolution might agree with you and you might get what you want. Do you agree with that? If the government is willing to concede that we have a right to make that claim and a right to have a judgment based on that claim and reviewed by the NLRB and ultimately reviewed by this court or some other U.S. Court of Appeals, then I agree. But it wasn't clear in the government's brief that I read that that was the case. So the board, in this case, adopted without change DLJ's findings and conclusions of the law. And I want to point out one particular aspect of that finding on the executive standard that I think is glaring. So at Joint Appendix 15, the judge, DLJ, makes the following conclusion. Health plans by their very nature, now quoting, are full of uncertainty. It is impossible to predict what claims may have come in, how it would impact the reserves. Such predictions are left to the benefits experts. But wait a minute. Doing that, the judge and the board swept aside every single piece of evidence that was put in this case. Every single actuary's report. There was an expert that testified. The GC called her to testify. And the expert said in September of 2019, weeks before this impasse was declared, that there were .07 weeks of reserves left. The funds increased to 1.6 million in December. And I just wasn't sure why. Do you know why? No. It could be a change of revenue versus expenses. Well, presumably. Right. But do you know why? As of December, the funds experts reported that there was less than two months of reserves remaining. But it went from 1.2 to 1.6 million. And I completely agree with you. Of course, it has to do with revenues versus expenses. Do you know if revenues went up? Did expenses go down? Well, revenues change from month to month, depending upon how many hours of work, how many employees are covered. So they vary. And obviously, expenses change from month to month. So one of the things... Maybe the answer is you just don't know. But do you know why? No. There is unanimity in the record. Unanimity in the record. As of December of 2019 and the months before that, the fund was in fiscal crisis. That's not my question. Okay. Proceed. Can I just ask, when you make those statements, are you relying on Ms. Lange and her statements in the record? I am, Judge. Not only her statements in the record, but also the actual reports of the actuary month to month or quarter to quarter that are in the record. Right. Yeah. And so what she says, for example, is in November, there's $1.2 million left in reserves. And what you portray that as is this fund is three weeks from collapse. That's not really what it means, right? That's if you entirely stopped bringing in money. Right. What it means... You're right. It doesn't mean it's three weeks from collapse. It means that it's an inappropriate standard for running a health care fund with thousands of participants. So this fund also had a relatively low, surprisingly low stop loss for $150,000. So anything below $150,000 was coming out of the fund's wallet. Everything above $150,000 is coming out of the reinsurance wallet. And there's quotes from Ms. Lange and from the union's chief negotiator that any number of claims that $100,000 or $150,000 will make this fund run out of money. That's in the fall of 2019 in the record. So again, it's not just a question of whether the employer had notice of the circumstances. Everybody had notice. In these kind of cases where there is experienced counsel and experienced experts involved in negotiations, you always have notice that the fund's going to run out of money. They had notice since 2018. And gradually, those numbers have gone up. I just have one more specific question. So I understand you're relying on Ms. Lange. My understanding, or at least the board found, that on December 5th, Ms. Lange supported the union proposal and then later testified that it would have continued to increase the reserves. What's your response to that? The response is that that disagrees with the union's chief counsel. It says we're ignoring reserves in our proposal. And I'll say that in the record, the union proposed in December 5th an increase of the contributions to $5.02, I think it was, where the union and Rite Aid, as a potential measure for trying to see if it could affect the fund, in three months, July, August, September of 2019, Rite Aid was contributing at $5.72. And that had very little effect on the reserves. So the union was proposing in the end a reduction in that, which we know would have not worked. And they were also proposing, just to be fair to them, they were also proposing that employees pay, because the employees weren't paying anything. What would have happened if you finished the sentence? I'm sorry, no, sorry. But that proposal that the union was making wouldn't kick in for 12 months after the $5.02 increase. So what would have happened if you waited until the fund ran out and then switched the employees from the union fund to the company fund? So the employees would have lost benefits. Because the payments are in arrears. So if the fund runs out of cash, I'm pregnant or I've got my arm broken, I'm going to the accident room, I put my medical card in, the administrative person calls the fund, the fund says I don't have funds, you don't get service. So what would have happened is the union would have insisted, again, this is not in the record, but this is just collective bargaining. The union would have said, blank check, you guys pay for it. You're the only employer in the fund, so issue a blank check. That's what we were facing. So a blank check is not what's in the collective bargaining agreement. What's in the collective bargaining agreement is X dollars a month per person. Thank you, Mr. What is the difference in the cost to the employer of having the health plan in the employer's fund as opposed to continuing with the union? Substantial. So the employer's fund, substantial. So I don't have the actual number of what it would have saved because the parties weren't focusing on that savings. The parties were focusing on the The reason why I say substantial is because that fund covered many more thousands of lives than the Valley Employers Fund. That fund covered all the rest of Rite Aid's employees across the United States. So not tens of thousands of employees, a lot more employees that spread the risk over in terms of the fund. That's why it would be cheaper. I understand. Thank you. Thank you. We'll give you a minute on rebuttal. Thanks. Morning, Heather Beard for the The substantial evidence on the record here demonstrated that the company failed to prove that they were at an impact when they implemented their new collective bargaining agreement, including the new Can you drop those microphones down a little bit? We'll hear you more clearly. Is this better? Yeah. Okay. So I'd like to address first the issue of impasse. Unless Judge Walker, I could go right to the remedy. It sounded like you had questions. I'll wait. Okay. So with regard to impasse, the board implied it's well-established factors looking at all of the evidence to determine that company didn't establish the party's word impasse on December 5th. Now, Judge Randolph's question to my friend on the other side was a good question about the cost of the new right aid plan that the company was going to go into. That was something that despite the union asking over and over what that cost would be, that was not revealed until two days before the final bargaining session when the union able to move very significantly towards keeping, as right aid said, it had wanted trying to keep it cost neutral. That is one of the factors, one of the important factors under TAP, which is the party's contemporaneous understanding. And at the end of the day on December 5th, the union had just received a few days earlier information as to how much more would the health care plan cost. And right aid said it was willing to spend either 1.2 or 1.4 million dollars a year in the right aid plan. So what the union came and testified and who supported what the union did is move as close as their understanding was to right aid once they had the information so that they could do what right aid said throughout the duration of the negotiations, which is we don't care whose name is on the health care plan, what we care about is actually covering these employees and getting a new collective bargaining. We agree it's very significant how many people are covered by this. And this new right aid plan did have employees who lost health care coverage. So we're not, this is not who's bad, who's good here. This is under the board standards were the parties at an impasse, which was the burden on the company. So we've got that factor number one alone sufficient, contemporaneous understanding. And the board went through, the board also found that the company negotiated in bad faith here. They found that the importance of the issue and the I agree with my friend on the other side, this counts in favor of the fact that the company failed to demonstrate an impasse. There was a long bargaining history here. And so the TAF factors are impasse. Now let's talk about economic exigency, if you will. The standard for economic exigency is whether there is a compelling reason to immediately implement something. There was not a compelling reason to immediately implement. Now it is true that the reserves in the fund, which the company continuously said they wanted to build them up so that they had three months. This was also part of the bad faith finding that my friend did not mention, which is that until the hearing, the company didn't tell the union that it was looking at six months that it wanted these reserves there. But what Ms. Lange also said is that regardless of the reserves in the fund, a health care fund doesn't collapse if the reserves are low. It depends on the amount of contributions and the amount of expenses. And from the record, what was happening with this fund as had happened for years, in fact, the fund had gotten low in 2013 and 2014, I believe, to 2.2 months, is that never had, I think it was 11 years, the company still did not need to contribute more even when the funds reserve dipped low. So this was something that the union was concerned about in 2018 when the report came out that the funds had dipped, I think it was, to 2.5 months. And the union said, let's talk about this, let's talk about it in 2018 before the year that our collective bargaining agreement is going to expire. And so given that, and given that the company always had the ability to increase contributions, which it did twice during the bargaining in 2019, there was no compelling reason to immediately change plans, which they would need to establish, again, it's their burden of proof under the economic exigency test. So on the substantial evidence in the case, which the judge and the board said, this is not a case where the company has carried its burden of being able to unilaterally implement. Ms. Beard. Can you turn to remedy now? Absolutely. So Judge Walker, your questioning of my friend is something that I want to echo here with regard to what is before this court properly about the remedy. When the ALJ issued the remedy here, the remedy did not include any sort of set off for what the plan would have saved had, for example, because the alternative plan went into effect. The remedy did not include that. Now, what my friend accepted to in its exceptions was the ALJ's remedy that included that set off. What it did not do is argue, put in front of the board, that restoring the fund and not allowing for any sort of offset was an abuse of discretion or was some sort of a windfall. They did not make that argument in front of the ALJ. Then what happened is the board issued its decision and did, as my friend stated and conceded, a different remedy. What the board did in its decision is say, you know what? There isn't going to be such a set off. We're going to give our standard remedy when there's a fund that employees still may have a legitimate interest in and we are going to say you restore the viability of the fund, which goes to status quo anti-relief. And that was when, if my opponent had an objection to such a set off or a windfall argument, that is when under Section 10E of the National Labor Relations Act, this court's decision in spectrum should have and needed to make an objection to the remedy that they're now making in their brief. Because they did not do that, they are foreclosed from making that argument. I get that. And you might be right. But where our discussion led, where I'd like to get some clarity from you, is there's a line in your brief, I think it says something along the lines of Rite Aid is, this may not be a direct quote, Rite Aid is free to make their remedy argument at the compliance proceedings. Sure. They are free to make traditional compliance arguments as to how much money they're owed. However, what the brief didn't say and what we are not saying is that in compliance, Rite Aid is free to argue that the fund would be getting that kind of a windfall. They cannot make that argument in compliance because the board's remedy, the standard remedy that the board They can't make a Grondorf argument? Correct. Depends what you mean by a Grondorf argument. The board's view is that in order to restore a fund to its undiminished viability, what needs to happen is the delinquent contributions to the fund have got to be restored, period. That's the board's holding, that's the board's view. The board did not engage with any sort of windfall, Grondorf, any of that because it wasn't raised to them. But to the extent you would do what I would ask which is enforce this order, there will be compliance proceedings. I believe in Grondorf the court talked about remanding. You don't ever have to remand for compliance. Compliance happens after a board order on the merits, but in a compliance proceeding there are various things an employer can do. I'm representing to this court, if this court enforces the order I do not believe in compliance that the company will be able to come in and make an offset windfall argument for the fund. The board's remedy in this case is its standard remedy. Is the union fund still in existence? I believe Or did it dissolve? I'm not 100% sure, Your Honor, because it's outside Suppose it dissolved. Suppose it's no longer in existence. Well, if the fund is no longer What I'm thinking about and what I'm focusing on trying to focus on in this question is the employees. I mean, if the remedy is what you say it is, then on the day that we enforce that remedy, do all the employees revert back to the union plan? Right. My understanding is that the plan is viable to the extent this court orders the board's remedy to take place, that the plan can be restored to what the board has ordered, which is to undiminished viability. But that's from the intervener union and my understanding, again, outside the record. But if there was, in compliance, Your Honor, my understanding is those kinds of arguments like impossibility, for example, if my friend wanted to argue on the other side, it's impossible. There is no fund. We can't restore it. Do believe that is something that can be raised in compliance. I think that the only twist here with regard to compliance is this issue of whether they could bring specific evidence in that claims would have been paid by the alternate fund. And one thing I also want to say about that is about should this court, which I don't think it should reach the Grondorf issue, this case is not like that in that in Grondorf there was the statement that the court made in Grondorf was that there were comparable health care benefits. It's not in dispute here, but health care benefits here do not include retirees. So retirees lost their health care in January 1st, 2020 when this went into effect. It doesn't include a platinum level plan. It only includes one lower plan, gold level plan. Is there anything in the union plan that bars pre-existing conditions? Your Honor, I'm not sure of the answer to that question. I don't know. My friend on the other side might know the answer to that question. But what the board is trying to do here is restore the status quo ante under its clear under its clear standards. And I would urge the court to go ahead and import. I just want to make sure I understand your point about the distinction between a Grondorf type argument and the argument that the company made in accepting to the ALJ's decision. So I'm just looking at this is page 36 of the appendix and it says respondent accepts to the recommended remedy of making all contractually required contributions to the fund as unit employees have been covered by a substantially similar health plan since Rite Aid's implementation after impasse. Now one reading of that is saying we need an offset here for the alternative benefit we've been providing. So I just want to make sure I understand what else should they have said? Sure. I would say that given what they were accepting to, the remedy from front of the ALJ did provide for that offset. The exact remedy that that exception I think it was number 52 was responding to was to the order which what the judge had in the order was there will be such a set off. So I myself do not understand what the exception was because that order had a set off. Not that the exception should have been different. If they had filed a motion for otherwise put this in front of the board after the board amended the remedy, it could say exactly what this said. It could also say there will be a, there could possibly be a windfall or an offset and the board would look at it and say well that's what the judge said and we changed it so that there isn't one. So that's where the 10E and the jurisdictional bar comes in. The board needs to be on notice that what the company is objecting to is that. Thank you. If there are no further questions, I will sit down. Thank you. One, the issue of reserves and the scarcity of reserves was an issue that the union raised in 2018. You raised it in 2018 bargaining meetings. They raised it in 2019 bargaining meetings. They raised it in every single bargaining meeting up to December when they flipped and said we don't care about the reserve anymore. If that's not evidence of bad faith bargaining, I don't know what is. That's a flip. So the judge, and I didn't do much about my impasse argument, but there's plenty of evidence in the record. Any experienced collective bargaining person would know that the union slow walked this all the way through those 18 months. They went months between meetings. They came to meetings with no proposals. They went golfing on a day that they said they would be there. They came in and threatened to strike when Rite Aid even suggested that its plan might help. And then they did. They did protest and they increased the protest. There's evidence of that in the record. They went on a campaign to get people to switch their prescriptions from Rite Aid to some other employer and appeared in tickets in front of the Rite Aid stores in Northern California. So that's evidence of impasse as well that was totally ignored by the judge. And to say, for example, that a proposal at the end was actually substantially breaking the impasse, Rite Aid just told the union it was an impasse in September when the union came to the table and threatened to strike. I'm still a little confused about what you're saying and a little bit confused about what the government is saying with regard to remedy. Let me try one more time for clarity. I'll read to you what the government said, I think, in the brief. Rite Aid is free to make their remedy argument at compliance proceedings. You mentioned that you were looking for a concession. Is that the concession you're looking for? Actually, I got the opposite concession from my friend here. What she said was, no, you don't have the right to introduce that evidence. That's how I heard it, too. And then I asked you earlier, are you challenging the alteration because the alteration leads to a windfall or not? Or are you challenging something beyond that? And you said just the alteration. When you said the alteration, the board's alteration to the ALJ's remedy. Yes. Well, obviously, I'm challenging the board's alteration to the ALJ's remedy, but I'm also taking a position that the refusal, the trial in this case had no introduction of that evidence or that issue. And so Rite Aid did not have an opportunity to put that in front of the ALJ. And then when the board altered the remedy, obviously, we didn't have any chance to put any evidence on that. You're only challenging the alteration by the board to the ALJ's remedy. Then that's forfeited because you didn't move for reconsideration. I don't believe one of the cases I'm required to move for reconsideration. The cases we cited all say that we're not required to do that. So, you know, I respectfully disagree with that. Thank you. Thank you.
judges: Walker, Garcia, Randolph